KAB

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Adrian Cooper,<br><br>Plaintiff,<br><br>v.<br><br>Robert McFadden, et al.,<br><br>Defendants. | No. CV 14-02108-TUC-JAS<br><br>**ORDER** |

Plaintiff Adrian Cooper, who is represented by counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 7.) Defendants move for summary judgment (Doc. 92), and Plaintiff opposes the Motion (Doc. 96).

**I.      Background**

After this action was dismissed on screening under 28 U.S.C. § 1915A(a), the Ninth Circuit Court of Appeals reversed and remanded, finding that Plaintiff "sufficiently alleged that [D]efendants Peterson, Campbell, and Cranford assaulted [Plaintiff] and prosecuted him with the purpose of denying him equal protection because [Plaintiff] was an African American who pursued grievances." (Doc. 17-1 at 2.) The Court of Appeals stated that Plaintiff stated malicious prosecution and equal protection claims. (*Id.*)

Plaintiff's equal protection claims were subsequently dismissed as barred by the statute of limitations. (Doc. 44.)

. . . .

. . . .

**II.     Motion to Supplement Authority**

Defendants seek to add supplemental authority to their Reply in Support of Motion for Summary Judgment, which they assert is "directly on point [with] Argument II.E, in which Defendants requested entry of judgment because *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), does not provide a remedy for Plaintiff's malicious prosecution claim (Doc. 98 at 7-12)." (Doc. 100.)

Indeed, in their Reply in Support of their Motion for Summary Judgment, Defendants argue that the Supreme Court's recent decision in *Egbert v. Boule*, ___U.S.___, 142 S.Ct. 1793 (2022) forecloses a *Bivens* lawsuit for a malicious prosecution claim. (Doc. 98 at 7-12.)

Prior to the *Egbert* decision, on January 16, 2019, the Court ruled that Plaintiff could pursue a malicious prosecution claim pursuant to *Bivens*. (Doc. 57.) While the Court agrees that the *Egbert* decision warrants reconsideration of the Court's prior Order, Defendants did not address this issue in a procedurally proper manner. Defendants could have properly filed a Motion seeking relief pursuant to Rule 60 of the Federal Rules of Civil Procedure from the Court's prior Order on this issue, but instead first raised this argument in a Reply to which Plaintiff was not entitled to a Response, and although Plaintiff did not oppose Defendants' request to supplement authority, the Court is hesitant to address this important issue without giving Plaintiff the opportunity to properly brief it.

Accordingly, Defendants' Motion to Supplement Authority will be denied. Because the Parties have briefed the merits of the malicious prosecution claim, the Court will address the merits of the Motion for Summary Judgment.

**III.    Motion for Summary Judgment**

   **A.     Legal Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying

those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**B.    Facts**

From February 12, 2009 to July 6, 2009, Plaintiff was incarcerated at FCI-Safford. (Doc. 93 ¶ 5; Doc. 97 ¶ 5.) In 2009, former Defendant McFadden was the Western Regional Director for the Bureau of Prisons (BOP), and his duties included overseeing the overall operations of all institutions within the Western Region, including all of the staff and inmates. (Doc. 93 ¶¶ 6-7; Doc. 97 ¶¶ 6-7.) The Western Region does not include Oklahoma, which is in the South Central Region. (Doc. 93 ¶ 9; Doc. 97 ¶ 9.)

McFadden first became involved in Plaintiff's regional administrative remedy

appeals when Plaintiff was transferred to FCI-Safford, which is in the Western Region, in February 2009. (Doc. 93 ¶ 13; Doc. 97 ¶ 13.) Before then, Plaintiff's regional administrative remedy appeals went to the South Central Regional Director, who was G. Maldonado, Jr., in 2008. (Doc. 93 ¶ 14; Doc. 97 ¶ 14.) While McFadden was the Western Regional Director, he was not responsible for the employees and officers in the South Central Region. (Doc. 93 ¶ 15; Doc. 97 ¶ 15.)

Defendant Peterson worked as a lieutenant at FCI-Safford during 2009, but his duties did not include handing out administrative remedy forms or reviewing administrative remedies, and he had no part in investigating Plaintiff's family's Office of Internal Affairs (OIA) complaint regarding events alleged to have occurred at FCI-El Reno, and he was not aware of the complaint or investigation when he worked at FCI-Safford. (Doc. 93 ¶¶ 16-20; Doc. 97 ¶¶ 16-20.) On July 6, 2009, Lt. Peterson was the Operations Lieutenant for the midnight to 8:00 a.m. shift, and he was not present when the alleged assault and excessive force that forms the basis for this lawsuit occurred. (Doc. 93 ¶¶ 21-22; Doc. 97 ¶¶ 21-22.) Lt. Peterson did not write a report, speak with the FBI or the United States Attorney's Office, participate in the decision to prosecute Plaintiff for assaulting three federal officers, or participate in the prosecution in any way. (Doc. 93 ¶ 23; Doc. 97 ¶ 23.)

Defendant Campbell was a Special Investigative Services (SIS) lieutenant at FCI-Safford in 2009. (Doc. 93 ¶ 25; Doc. 97 ¶ 25.) When Plaintiff was transferred to FCI-Safford, Lt. Campbell was assigned to assist FCI-El Reno regarding an OIA investigation requested by Plaintiff's family regarding events alleged to have occurred at FCI-El Reno before Plaintiff was transferred. (Doc. 93 ¶ 26; Doc. 97 ¶ 26.)

OIA investigations are separate and independent from the Administrative Remedy Program, and allow an inmate to report staff misconduct through the Department of Justice (DOJ), Office of Inspector General (OIG), or through the Bureau's Office of Internal Affairs (OIA). (Doc. 93 ¶ 27-28; Doc. 97 ¶ 27-28.) The DOJ OIG "investigates alleged violations of criminal and civil laws by DOJ employees and also audits and inspects DOJ

programs, and the Inspector General, who is appointed by the President subject to Senate confirmation, reports to the Attorney General and Congress." (Doc. 93 ¶ 29; Doc. 97 ¶ 29.) Conversely, the Bureau's OIA investigates "violations and allegations of violations per the Standards of Employee Conduct and "[t]o maintain its high level of independence and credibility, OIA is a component of the Director's Office, Bureau of Prisons." (Doc. 93 ¶ 31; Doc. 97 ¶ 31 (citations omitted).)

In 2009, Plaintiff's then-wife submitted an email complaint to the OIG, which, instead of investigating the complaint, referred it to the OIA, which referred it to the institution to investigate. (Doc. 93 ¶ 32; Doc. 97 ¶ 32.) Campbell conducted the OIA investigation, but did not find the OIA complaint to be substantiated in any way. (Doc. 93 ¶ 33; Doc. 97 ¶ 33.) Plaintiff asserts that Campbell told him at unspecified times that "black people shouldn't file complaints" and "niggers shouldn't use the system." (Doc. 97-1 ¶ 34.) Campbell was in the Lieutenant's Office at FCI-Safford on July 6, 2009, when a call came in from Health Services that a lieutenant was needed to help with an inmate, and he went to Health Services in response to the call. (Doc. 93 ¶¶ 34-35; Doc. 97 ¶¶ 34-35.)

Cranford[1] was an SIS Technician at FCI-Safford in 2009, and never met or interacted with Plaintiff before July 6, 2009. (Doc. 93 ¶¶ 36-37; Doc. 97 ¶¶ 36-37.) On July 6, 2009, Cranford received a call in the Lieutenant's Office from Health Services that they needed a lieutenant to help with an inmate, and he went to Health Services in response to the call. (Doc. 93 ¶¶ 38-39; Doc. 97 ¶¶ 38-39.)

On July 2, 2009 at about 5:30 p.m., Plaintiff went to Health Services at FCI-Safford requesting renewal of a lower bunk pass. (Doc. 93 ¶ 40; Doc. 97 ¶ 40.) Plaintiff became frustrated and angry when Registered Nurse Holly Schultz denied the bunk pass, and he

---

[1] Plaintiff asserts that at some unspecified time, Cranford told Plaintiff "niggers shouldn't use the system" (Doc. 97-1 ¶ 36), but Defendants point out that this contradicts Plaintiff's deposition testimony where Plaintiff stated he never met Cranford before July 6, 2009. (Doc. 99 at 5.) Plaintiff likewise did not dispute Defendants' asserted fact that Cranford and Plaintiff never met prior to July 6, 2009.

tried to intimidate her.[2]  (Doc. 93 ¶ 41.)  RN Schultz took Plaintiff to the Lieutenant's Office for her own safety.  (*Id.* ¶ 42.)  RN Schultz then issued Plaintiff a lower bunk pass through the weekend, after which time he would have to go to sick call to be assessed by a physician.  (Doc. 93 ¶ 43; Doc. 97 ¶ 43.)  The lower bunk pass was issued at 6:18 p.m., after the clinic was closed.  (Doc. 93 ¶ 44; Doc. 97 ¶ 44.)

On July 6, 2009, Plaintiff went to Health Services and attempted to address his many issues with the doctor.  (Doc. 93 ¶ 45; Doc. 97 ¶ 45.)  The doctor insisted that Plaintiff

---

[2] Plaintiff notes that this fact is "disputed" in his controverting statement of facts (Doc. 97 ¶ 41), but Plaintiff cites to no portion of the record supporting his dispute.  This is true for all "disputes" that Plaintiff makes in his controverting statement of facts, and violates Rule 56(c) of the Federal Rules of Civil Procedure and Local Rule of Civil Procedure 56.1, which provides

> Any party opposing a motion for summary judgment must file a statement, separate from that party's memorandum of law, setting forth: (1) for each paragraph of the moving party's separate statement of facts, a correspondingly numbered paragraph indicating whether the party disputes the statement of fact set forth in that paragraph and a reference to the specific admissible portion of the record supporting the party's position if the fact is disputed; and (2) any additional facts that establish a genuine issue of material fact or otherwise preclude judgment in favor of the moving party. Each additional fact must be set forth in a separately numbered paragraph and must refer to a specific admissible portion of the record where the fact finds support.

LRCiv 56.1

Accordingly, the Court will consider Defendants' facts undisputed unless the Court can clearly ascertain from evidence submitted by Plaintiff that the fact is disputed.  *See* Fed. R. Civ. P. 56(e)(2).

Plaintiff also filed a Declaration, which he does not cite to when disputing facts, and it is unclear what part of the Declaration may support his disputes.  In his Declaration, Plaintiff describes multiple events that are apparently irrelevant to the current malicious prosecution claim pending before the Court.  For example, Plaintiff includes facts that suggest First Amendment retaliation claims against Defendant Peterson that are not related to Plaintiff's prosecution.  Because it is unclear how these allegations are relevant to the malicious prosecution claim pending before the Court, the Court does not set forth those facts.

follow the policy of addressing only his main issue so that all inmates could be seen. (Doc. 93 ¶46; Doc. 97 ¶ 46.)³ Plaintiff became combative and raised his voice and was directed out of the exam room. (Doc. 93 ¶ 47.) Similarly, on June 12, 2009, the same doctor sent Plaintiff out of the exam room when he became upset at what the doctor told him and began insulting and threatening him. (Doc. 93 ¶ 48.) After leaving the exam room, Plaintiff encountered Nurse Elie and Ms. Harmon in the hallway, and an altercation ensued. (Doc. 93 ¶ 49; Doc. 97 ¶ 49.)⁴

Nurse Elie and Ms. Harmon ordered him to turn to face the wall, and he did not. (Doc. 93 ¶ 50.) Ms. Harmon attempted to place handcuffs on him, but they did not fit. (Doc. 93 ¶ 51; Doc. 97 ¶ 51.) Nurse Elie asked Ms. Gonzales to call the lieutenant for assistance. (Doc. 93 ¶ 52; Doc. 97 ¶ 52.) Ms. Gonzales called the Lieutenant's Office and told Cranford they needed assistance from a lieutenant. (Doc. 93 ¶ 53; Doc. 97 ¶ 53.) While Lt. Campbell and Cranford were on their way to Health Services, Ms. Harmon, Ms. Gonzales, RN Schultz and Nurse Elie hit their body alarms. (Doc. 93 ¶ 54.) Nurse Elie left the hallway and went to the front door to let in assistance. (Doc. 93 ¶ 55; Doc. 97 ¶ 55.)

Lt. Campbell and Cranford were first on the scene and attempted to gain control of Plaintiff. (Doc. 93 ¶ 56.) According to Cranford, Plaintiff threw him "6 to 8 feet" and he "landed on [his] back against the opposing wall." (*Id.* ¶ 57.) According to Ms. Harmon, "Inmate Cooper raised his left arm, raised it up to the side and back throwing Officer Cranford up in the air and against the opposite wall." (*Id.* ¶ 58.) According to Ms.

---

³ Although Plaintiff does not dispute that he attempted to address many issues with the doctor, he claims he went to the clinic because he was ordered to go by Defendant Peterson. (Doc. 97-1 ¶ 46.)

⁴ Although Plaintiff does not dispute this fact, he alleges that he was "ordered from the crowded lobby by a [unidentified] secretary and the secretary "pretended to handcuff" him after which he was "attacked" by Defendant Correctional Officer Cranford and Campbell and "other correctional officers arrived to participate in beating" him. (Doc. 97-1 ¶¶ 47-59.)

Gonzales, Plaintiff "sw[u]ng his arm and Officer Cranford flew down the hallway . . . right in front of her." (*Id.* ¶ 59.) According to Lt. Campbell, Plaintiff "threw Officer Cranford down the hall." (*Id.* ¶ 60.) According to RN Schultz, "Mr. Cooper threw Mr. Cranford to the side." (*Id.* ¶ 61.) From the lobby, Inmate Martinez saw "one of the correction officers fall down to the ground." (*Id.* ¶ 62.) Dr. Gaskin saw Plaintiff "without much action he just kind of like threw them into the air like they were rag dolls." (*Id.* ¶ 63.) Plaintiff asserts that Defendant Cranford placed him in a choke hold, and Cranford suffered injuries to his ribs and fingers when Plaintiff "tried to loosen Defendant Cranford's grip so that [he] could breathe." (Doc. 97-1 ¶¶ 51-52.)

Dr. Gaskin then grabbed Plaintiff's left arm. (Doc. 93 ¶ 64; Doc. 97 ¶ 64.) Dr. Gaskin remained focused on Plaintiff's left arm and did not see what happened with his right arm. (Doc. 93 ¶ 65.) Plaintiff banged Lt. Campbell into the wall and Ms. Harmon into the window sill. (*Id.* ¶ 66.) Plaintiff asserts that when testifying for the prosecution at Plaintiff's criminal trial, Defendant Campbell claimed that Plaintiff slammed him into the wall, but a witness for the government testified that he never saw Plaintiff touch Campbell. (Doc. 97-1 ¶¶ 53-54.)[5] They managed to get Plaintiff on the ground. (Doc. 93 ¶ 67; Doc. 97 ¶ 67.) Others responding to the body alarms arrived to take control. (Doc. 93 ¶ 68; Doc. 97 ¶ 68.)

Lt. Campbell, Cranford and Ms. Harmon retreated to an exam room to be medically evaluated. (Doc. 93 ¶ 69.) Lt. Campbell and Ms. Harmon were treated at Health Services. (*Id.* ¶ 70.) Cranford went to the Emergency Room for further evaluation. (*Id.* ¶ 71.)

On July 7, 2010, the "Inmate on Staff" assault was referred to the FBI on a "Referral of an Inmate Criminal Matter for Investigation" form. (*Id.* ¶ 72.) The "Law Enforcement Action" noted was "accepted referral to AUSA for prosecution." (Doc. 93 ¶ 73; Doc. 97 ¶ 73.) The prosecutor presented the case to the Grand Jury. (Doc. 93 ¶ 74.) On February 3,

---

[5] Plaintiff bases these facts on his personal knowledge of what he observed at trial, but this is hearsay, and he does not produce any evidence supporting these statements. Plaintiff likewise offers no testimony or supporting evidence that he, in fact, did not slam Campbell into the wall.

2010, the Grand Jury indicted Plaintiff for three counts of assault on a federal officer in violation of 18 U.S.C § 111(a) and (b). (*Id.* ¶ 75.) On March 16, 2010, Plaintiff had his initial appearance, and on March 18, 2010, Plaintiff was arraigned and ordered detained pending trial. (Doc. 93 ¶ 76; Doc. 97 ¶ 76.) The Court found "probable cause to believe that the defendant has committed an offense." (Doc. 93 ¶ 77; Doc. 97 ¶ 77.) Plaintiff's trial was held May 22, 2012 through May 25, 2012. (Doc. 93 ¶ 77; Doc. 97 ¶ 77.) The prosecution called Inmate Gonzalez, Nurse Elie, Ms. Harmon, Ms. Gonzales, Cranford, Lt. Campbell, RN Schultz and Dr. Gaskin as witnesses. (Doc. 93 ¶ 79; Doc. 97 ¶ 79.) The defense called Mr. Jennings, Inmate Martinez and Inmate Herrera Davilla as witnesses. (Doc. 93 ¶ 80; Doc. 97 ¶ 80.) Lt. Peterson did not testify at the trial. (Doc. 93 ¶ 81; Doc. 97 ¶ 81.)

On May 25, 2012, the jury found Plaintiff not guilty of assault on Lt. Campbell and Ms. Harmon. (Doc. 93 ¶ 84; Doc. 97 ¶ 84.) The jury could not reach a verdict as to assault on Cranford, and a mistrial was declared as to Count One. (Doc. 93 ¶ 85; Doc. 97 ¶ 85.) On September 4, 2012, the United States dismissed the indictment against Plaintiff without prejudice. (Doc. 93 ¶ 86; Doc. 97 ¶ 86.)

### C. Malicious Prosecution

In order to prevail on a § 1983 claim of malicious prosecution, a plaintiff "must show that the defendants prosecuted him with malice and without probable cause, and that they did so for the purpose of denying him equal protection or another specific constitutional right." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (citations omitted). "Malicious prosecution actions are not limited to suits against prosecutors but may be brought, as here, against other persons who have wrongfully caused the charges to be filed." *Id.* at 1066-67 (citation omitted).

However, "[w]itnesses, including police officers, are absolutely immune from liability for testimony at trial, and before a grand jury." *Lisker v. City of Los Angeles*, 780 F.3d 1237, 1241–42 (9th Cir. 2015) (citations omitted). "Absolute witness immunity also extends to preparatory activities 'inextricably tied' to testimony, such as conspiracies to

1 testify falsely." *Id.* (citations omitted). "Were it otherwise, a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves." *Id.* (citation omitted). Therefore, to show that Defendants are not entitled to absolute immunity, Plaintiff must provide evidence that Defendants engaged in "'non-testimonial' acts, such as 'tampering with documentary or physical evidence or preventing witnesses from coming forward'" that led to his prosecution. *Id.* (citation omitted).

### D. Discussion

Defendants assert that they are entitled to summary judgment because probable cause was found multiple times throughout Plaintiff's prosecution. Defendants further assert that Plaintiff has no evidence of any actions any of the Defendants took in relation to the prosecution, other than Campbell and Cranford testifying at trial, for which they have absolute immunity. Defendants assert that Plaintiff has presented no evidence that Defendants created false reports that were presented to the FBI or the United States Attorney's Office or played any part in the prosecution, and Plaintiff has provided no evidence that his prosecution was based on fabricated evidence or any improper conduct on the part of Defendants.

Defendants point out that Peterson was not present at the alleged assault, did not take part in any investigation, and did not testify at trial.

In Response, Plaintiff acknowledges that acquittal itself is insufficient to pursue a claim of malicious prosecution, but he asserts that he "also claims that the allegations that were the basis for his indictment and prosecution were false." (Doc. 96 at 4.) Plaintiff asserts that he "may be able to prove that the Defendant's conduct involved knowingly false accusations and other similarly conspiratorial conduct that was instrumental in causing the filing and prosecution of the criminal proceedings." (*Id.* at 5.) Plaintiff asserts that he

> has presented sufficient evidence that he was falsely accused of attacking Defendants Cranford and Campbell. He has also presented evidence that these allegations were made in part as

>retaliation for his filing of grievances and appeals regarding the conduct of prison personnel. The prosecution would not have been initiated if Defendants had not falsely reported that they had been attacked by Plaintiff on July 6, 2009. In addition, both Defendant Cranford and Campbell testified at the trial against Plaintiff that they had been assaulted by Plaintiff. However, Plaintiff has presented controverting evidence that he was the one who was attacked by Defendants Cranford and Campbell.

(Doc. 96 at 5.)

Even assuming that Plaintiff's general and vague allegations in his Declaration could be considered evidence that Defendants assaulted him and that Plaintiff did not engage in the assaultive conduct described by Defendants, Plaintiff does not argue or otherwise produce any evidence that Defendants committed any "non-testimonial acts" that led to his prosecution.[6] The acts Plaintiff described in his Response to the Motion for Summary Judgment are all testimonial, and Defendants are therefore entitled to absolute immunity for their testimonial acts and any alleged conspiracy to falsely testify. Accordingly, Defendants' Motion for Summary Judgment will be granted.

**IT IS ORDERED**:

(1)   Defendants' Motion to Supplement Authority (Doc. 100) is **denied**.

(2)   Defendants' Motion for Summary Judgment (Doc. 92) is **granted**, and the action is terminated with prejudice. The Clerk of Court must enter judgment accordingly.

Dated this 15th day of February, 2023.

Honorable James A. Soto
United States District Judge

---

[6] There is no evidence that Defendant Peterson was involved in the prosecution of Plaintiff and therefore, Defendant Peterson is also entitled to summary judgment on this independent basis.